Constance K. Mock, Plaintiff-Appellant, v. George F. Higgins et al., Defendants-Appellees.

Gen. No. 10,755.

Opinion filed September 22, 1954. Rehearing denied October 5, 1954. Released for publication October 5, 1954.

ROBERT V. JONES, of Chicago, and JOHN S. WOODWARD, of Wheaton, for appellant.

GORDON MOFFETT, and EDGAR J. ELLIOTT, both of Wheaton, PAUL FARTHING, of Belleville, and CHARLES CLAFLIN ALLEN, of St. Louis, Missouri, for appellees.

MR. JUSTICE WOLFE delivered the opinion of the court.

On November 16, 1930, Henrietta E. Garrett died in Philadelphia, Pennsylvania, leaving an estate of over seventeen million dollars. She left a will that disposed of only sixty thousand dollars of her estate and the balance became intestate property. The estate was administered in the orphans' court of Philadelphia county, Pennsylvania. So far as known, the decedent left no near relatives and over twenty-six thousand people filed claims, alleging that they were relatives of the decedent and entitled to a distributive share of the estate.

Howard S. Kretschmar filed a claim and asserted that he was a first cousin of the deceased. In 1932 Kretschmar employed Alan Dawson, a lawyer of Philadelphia, Pennsylvania, to represent him and prosecute his claim, as being an heir to this estate, and Dawson was to receive ten per cent of any money that was recovered by Kretschmar if he was proven to be an heir and entitled to a distributive share of the estate. On November 14, 1933, Kretschmar made an assignment of his interest in the Garrett estate to his daughter, his only child, Constance K. Mock, subject to the ten per cent interest that he had agreed to pay Dawson for his services, and from that time on Attorney Dawson represented Constance K. Mock.

On November 20, 1933, Kretschmar died leaving an instrument, purporting to be his last will and testament. This will was not offered for probate until May 22, 1953. By this will the daughter was made the residuary legatee and executrix of the same.

After Kretschmar died, Attorney Dawson filed a claim in the Garrett estate in the orphans' court asserting that Kretschmar was an heir of Henrietta E. Garrett's estate, as a first cousin and that Constance K. Mock had succeeded to Kretschmar's rights as assignee, legatee and heir at law. On November 21,

1951, the orphans' court of Philadelphia county, Pennsylvania, found that Kretschmar was one of three first cousins who had survived Henrietta E. Garrett and these cousins were her heirs and that Constance K. Mock was entitled to her father's share in the estate as assignee. The court awarded to Constance K. Mock a one-third interest in the Garrett estate subject to other claims that were being contested at the time. This order was confirmed by the Supreme Court of Pennsylvania.

John S. Leahy, an attorney in St. Louis, Missouri, through some lawyers in New York City, learned that Herman A. Kretschmar was living near St. Louis, Missouri, and probably was a first cousin and heir of Henrietta E. Garrett, deceased. He got into communication with Herman A. Kretschmar, but Herman did not seem to be interested in the matter. Attorney Leahy was acquainted with Chester H. Farthing, a lawyer admitted to practice in Illinois, and who at that time had offices in East St. Louis, Illinois. Farthing and Leahy were well acquainted and handled many legal matters together before. George F. Higgins was the public administrator of Du Page county, Illinois. On September 24, 1936, Chester Farthing went to Wheaton, Illinois, and met Mr. Higgins and Joseph Samuel Perry, an attorney of Du Page county, who had frequently represented the public administrator in probate matters. A petition was prepared and presented to the probate court of Du Page county, whereby George F. Higgins was appointed administrator of the estate of Howard S. Kretschmar, deceased. The only estate that Howard S. Kretschmar had was the claim that he had filed in the orphans' court in Pennsylvania, claiming to be an heir of Henrietta E. Garrett. Attorney Farthing was employed by Higgins to represent him in this estate. After Higgins had been

appointed administrator of the Kretschmar estate, Mr. Bragdon, an attorney in Chicago, told Mr. Farthing that Kretschmar had made an assignment of his interest in the Garrett estate to his daughter, Constance K. Mock, and also had left a will leaving everything that he had to his daughter, Constance K. Mock. Bragdon sent him copies of the same with exceptions, some deleted parts in the assignment agreement, and the will which did not bear any witnesses' signature.

The orphans' court of Philadelphia county appointed a master to hear the various claims of the people that claimed to be heirs in the estate. The hearings dragged along until April 1949, when Attorney Dawson went to St. Louis and conferred with Attorneys Farthing and Leahy for about a week. The contract, which is now in litigation, was prepared in the office of Mr. Leahy, the St. Louis attorney, and he testified that he never saw Mrs. Mock in connection with the contract, or of the signing of the same, "that the contract was prepared in my office and largely dictated by Mr. Dawson. Mr. Farthing and I were present and made suggestions. After Mr. Farthing and I had signed it, Mr. Dawson took nine copies of the instrument to Chicago. He subsequently wired us Mrs. Mock had signed the contract." This evidence is in no way disputed or contradicted. The contract is signed by George F. Higgins, John S. Leahy, Chester H. Farthing, Joseph Samuel Perry and Constance K. Mock, and describes in detail what the parties shall do. In substance Higgins, Leahy, Farthing and Perry were to use their best efforts to establish the fact that Howard S. Kretschmar was an heir and entitled to a distributive share in the estate of Henrietta E. Garrett, and for their services they were to receive ten per cent of the amount collected by Constance K. Mock, or the estate of Howard S. Kretschmar, deceased, or the sum of $250,000, which-

ever amount should be the greater. They were successful in their efforts and Constance K. Mock was adjudged to be entitled to one-third of the estate, which was somewhere near three and one-half million dollars.

The State of Pennsylvania claimed the whole of the estate alleging that there were no heirs and under the laws of Pennsylvania the estate was to escheat to the State. The State of Pennsylvania had other claims against the estate and these were all compromised for the sum of four million dollars in which Attorneys Farthing and Leahy took an active part.

After Constance K. Mock had received her money in the estate, she became dissatisfied with the contract and started a suit in the circuit court of Du Page county, against George F. Higgins, John S. Leahy, Chester H. Farthing, Joseph Samuel Perry and (Mary Ranney, who was the assignee of John S. Leahy of his share in the contract), alleging that there was a fiduciary relation existing between herself and the defendants; that there is no consideration for the contract; that the same was signed under duress; that the contract was uncertain and void; that John S. Leahy was not admitted to practice law in the State of Illinois and the contract was therefore void; that there was undue influence asserted upon the plaintiff, Mrs. Mock, to sign the same, and that the contract was void because it was contrary to the laws of the State of Illinois, regarding maintenance and champerty, and that the contract was obtained as a result of a conspiracy against the plaintiff.

The plaintiff called each of the defendants for cross-examination under section 60 of the Practice Act [Ill. Rev. Stats. 1953, ch. 110, § 184; Jones Ill. Stats. Ann. 104.060] and had them identify correspondence between themselves and Mr. Dawson, the attorney in Pennsylvania.

■ Mrs. Mock was also called as a witness and her evidence as abstracted is as follows: "My name is Constance Kretschmar Mock. I reside at 1504 West Cullom Avenue, Chicago. I am the plaintiff in this case. Mr. H. Alan Dawson was my Attorney from 1936, to the time this contract was signed." She also identified plaintiff's Exhibit No. 1, and said: "It was signed in the office of Mr. Bragdon. He was Mr. Dawson's Chicago representative in the case. He was one of my attorneys at that time." Her attorney offered to prove that Mrs. Mock had a conference with her attorney, Mr. Dawson, before the contract in question was signed, and that she first refused, then she was persuaded to sign it because it was necessary in order to avoid prolonged litigation. We will say at this time, that we think that the court properly refused this offer, as there is no intimation that the defendants, or any of them had anything to do with this matter.

The defendants offered no evidence, and at the conclusion of the evidence the court said: "The plaintiff here seeks relief in a court of equity. From the evidence which has been presented it appears to me that the problem has been more or less brought on by herself.

"As I recall the testimony of the plaintiff, Howard S. Kretschmar died on November 20, 1933. In 1953 his will is presented to the Probate Court of Du Page County for probate. There is also apparently an assignment of all his interest in the Garrett estate, executed some six or eight days before his death in 1933.

"I am unable to understand why the plaintiff failed to present that will, or why she failed to present that assignment. She apparently cooperated with Mr. Higgins, the Public Administrator all through the course of this time from 1936 or 1937 until the filing

of this suit in September, 1953, except, apparently, in the objections which were refused admission here in asking to probate the will.

"I do not know the reason why that was done. Her rights could have been easily and properly adjudicated by presenting that will on the death of her father, and also by the assignment.

"To me it appears that Mrs. Mock and Mr. Dawson have used these men to furthering their position in the Philadelphia Orphans' Court. It is rather incomprehensible that equity should be cognizant now to take her out of a predicament which she herself, through her attorneys—although she might not have done it individually as her own voluntary action—to come in now and ask to be relieved of a long course of some twenty years of, shall we say, utter disregard of the laws of the State of Illinois.

"So draft the order. Complaint dismissed for want of equity." The order of the court is as follows: "This matter coming on to be heard on motion of the defendants at the conclusion of the plaintiff's case for judgment for the defendants and each of them, and to dismiss the case as to them and each of them for want of equity; and the Court being fully advised in the premises, DOTH FIND that there is no evidence in the record tending to prove the allegations in the Complaint.

"And the Court further finds that the plaintiff by her entire course of conduct, is estopped from maintaining this action." Then follows the judgment in favor of the defendants. It is from this order that Constance K. Mock had perfected an appeal to this court.

It is insisted by the appellant that there was a fiduciary relation existing between Mrs. Mock and these defendants, therefore, the burden of proof is upon the defendants to show that the contract was

290

fairly entered into and the presumption would be that the contract is void. From reading the record as abstracted, we find no evidence that sustains the contention that there was a fiduciary relation existing between the parties at the time the contract was entered into. This being the case, the burden of proof was then upon the plaintiff to show wherein the contract was illegal and void.

In plaintiff's brief we find the following: "The plaintiff's theory of the case is that she is not estopped or barred from asserting the invalidity of the contract of April 27, 1949, and that that contract is void because (1) it was obtained as the result of a conspiracy against the plaintiff, (2) it was obtained by duress, (3) the defendants' conduct constituted champerty and maintenance, (4) the contract is vitiated by illegal provisions, (5) it is not supported by any consideration, (6) it is uncertain in its provisions, and (7) it constituted a breach of the fiduciary relation existing between the defendants and the plaintiff."

█ It is argued in appellant's brief that the defendants committed perjury by swearing falsely, and in knowing at the time that it was false, when they swore that Constance K. Mock was a resident of the State of Michigan at the time administration was taken out in Du Page county on her father's estate. This is a serious charge to make against anyone, especially against a brother attorney when there is not a word of proof in this record that Mrs. Mock was not a resident of Michigan at the time they say she was, and under the circumstances the attorneys making such assertions in their argument should be censured for such conduct.

█ Much is said in the argument about whether this court should take jurisdiction of a constitutional question, but in an examination of the pleadings and the evidence in the case, we find there was no constitu-

291

tional question presented to the trial court, so consequently it is immaterial whether this court does, or does not have authority to pass upon a constitutional question relating to the will of Howard S. Kretschmar, deceased, and the assignment of Mr. Kretschmar to his daughter, Mrs. Mock.

■■ It is stated on page 28 of appellant's brief: "It should first be noted that there is no evidence in this record that Kretschmar left a valid will entitled to be probated. The will of Kretschmar, moreover, has very little to do with this case." We are in accord with that statement, as the will in our opinion has nothing to do in passing upon the validity of the contract in question. Plaintiff does go on in the same paragraph of her brief to state that the will in question shows that the defendants had intermeddled in the Kretschmar estate, and the same was contrary to the statute. With this statement we cannot agree, as under the law at the time, the public administrator was appointed to administer the Kretschmar estate, the time had gone by for the heir to administer it. It was perfectly legal and proper for the public administrator to take out administration on the estate.

■■ Plaintiff alleges that the contract is illegal and void because John S. Leahy agreed to render legal services, as provided in the contract, as he was not admitted to practice law in the State of Illinois, and that he violated the law as provided in chapter 13, section 1 of the Illinois Revised Statute [Jones Ill. Stats. Ann. 9.01], and then quotes the sections. However, plaintiff fails to quote section 12 [Ill. Rev. Stats. 1953, ch. 13, § 12; Jones Ill. Stats. Ann. 9.12] of the same chapter, which is as follows: "When any counselor or attorney at law, residing in any other state or territory, may desire to practice law in this state, such counselor or attorney shall be allowed to practice in

the several courts of law and equity in this state upon the same terms and in the same manner that counselors and attorneys at law residing in this state now are or hereafter may be admitted to practice law in such other state or territory." It is common knowledge that Missouri lawyers practice in the State of Illinois, and that Illinois lawyers practice in the State of Missouri, so we find no merit in the contention that the contract is void, because Mr. Leahy was not admitted to practice law in the State of Illinois.

██ ██ We find no evidence in the record that supports the charge that the contract was obtained as a result of a conspiracy by the defendants against the plaintiff. As before stated, Mr. Dawson, the plaintiff's attorney, came to the office of Mr. Leahy in St. Louis and spent nearly a week with Mr. Leahy and Mr. Farthing in discussing the legal aspects of the case, and how to obtain further proof that Howard S. Kretschmar was an heir of Henrietta Garrett and entitled to a distributive share of her estate. The contract in question was largely the work of Mr. Dawson (Mrs. Mock's attorney), and after the contract was signed by Leahy and Farthing, Mr. Dawson took the contract to Mrs. Mock and she signed it. None of the defendants had anything to do with Mrs. Mock signing the contract. There is no evidence to sustain the charge of conspiracy, and the same facts are applicable to the charge that Mrs. Mock signed this contract under duress. There is no evidence whatsoever, that the defendants in any way could be charged with such acts.

██ ██ It is also charged that the contract is void because of its uncertain provisions. It seems to us on a careful reading of this contract, that while it is voluminous, its terms are stated in a skillful and no uncertain language. It is also claimed that the contract

293

is not supported by consideration. At the time this contract was signed, the case had been carried on for twelve years or more and Mr. Dawson apparently was not getting the results that Mrs. Mock desired. He evidently needed help in getting the court to hold that Mr. Kretschmar was an heir of Henrietta Garrett. Evidently Mrs. Mock was anxious to get the matter closed so that she could receive her inheritance, and felt that the defendants could assist her not only in getting the inheritance, but getting it sooner than Mr. Dawson could. Shortly after this contract was signed Mr. Dawson died, and the defendants carried on the litigation to a successful conclusion. The contract provides that, if they were successful in establishing the relationship of the parties, they should be paid ten per cent of the amount received, or $250,000, whichever was the greater amount, and the costs of litigation should be paid out of Mrs. Mock's share of the estate, but if they were not successful in establishing the relationship, that either Kretschmar or Mrs. Mock was an heir and entitled to a distributive part of the estate, they were to get nothing for their services. We hold that there was a good consideration expressed in the contract.

It is insisted by the appellant that the conduct of the defendants constituted maintenance and champerty, and the contract in question is therefore void. In the case of *West Chicago Park Com'rs v. Coleman,* 108 Ill. 591, the language there used by our Supreme Court is applicable to the facts in this case, and we there find the following: "Mary Ann Coleman, claiming to be the owner of an undivided half of a certain piece of land then in the adverse possession of another, and being desirous of instituting proceedings for the recovery of the same, employed Forrester, Beem & Gibbs, attorneys at law, to conduct said proceedings, and in

294

payment thereof conveyed to them a part of her interest in the land. The additional fact appears, that these attorneys had advanced money for her to pay for an abstract of title to the land. It is not altogether clear whether this advance by them constituted a part of the consideration of their purchase; but whether it did or not is wholly immaterial, as that was a matter entirely collateral to the contemplated suit, and constituted no part of the costs or expenses of it. So far as this record shows, these attorneys did not undertake to pay one cent of her costs or expenses in the maintenance of the suit, which is a complete answer to the claim the conveyance was a champertous contract. To make out a case of champerty it is not sufficient to show that a part of the thing recovered was paid or agreed to be paid as an attorney's fee. It must also be shown that the costs and expenses of the suit, or some parts of them, are paid or agreed to be paid by the champertee. In Chitty on Contracts, (10th Am. ed.) page 745, the author defines champerty to be, 'A bargain with a plaintiff or defendant to divide the land or other matter sued for, between them, if they proceed at law, whereupon the champertee is to carry on the party's suit at his own expense.' It is clear from this definition, the case at bar does not come within its terms."

██ In *North Chicago St. R. Co. v. Ackley,* 171 Ill. 100, we find the following:

"It is also claimed that the agreement sought to be enforced violates the rule against maintenance and champerty. It will be observed that by the terms of the contract the attorney, Ackley, was to receive for his services one-half of the amount to be recovered, but by the express terms of the agreement court costs and necessary expenses were to be advanced by Mary Butler. To make out a case of champerty it is not sufficient to show that a part of the thing recovered was paid or

295

agreed to be paid as an attorney's fee. It must also be shown that the costs and expenses of the suit, or some part of them, are paid or agreed to be paid by the attorney. (*West Chicago Park Comrs. v. Coleman,* 108 Ill. 591.) This is the rule established in the case cited and also in *Thompson v. Reynolds,* 73 Ill. 11, and *Phillips v. South Park Comrs.* 119 Ill. 626. Under the law as declared in these cases the objection to the contract is, in my opinion, not well taken."

 A splendid case in regard to whether a contract violates the law in regard to maintenance and champerty is *Molthrop v. New York, C. & St. L. R. Co.,* 245 Ill. App. 8, and the facts and the law applicable thereto are stated as follows: "Before a case of champerty will be made out, it must be shown that a lawyer entered into an agreement with his client to represent him in certain litigation and agreed to pay the costs and expenses of the litigation himself. Such is not the case where the lawyer makes advancements of these amounts for his client's use. 11 C. J. ¶ 27, p. 245; *Christie v. Sawyer,* 44 N. H. 298; *Wallace v. Chicago, M. & St. P. Ry. Co.,* 112 Iowa 565. In the *Christie* case the court said: 'So long as the law gives countenance and encouragement to the employment of attorneys and counsel, to aid suitors in the prosecution and defense of their supposed rights, it cannot be deemed maintenance for professional men to render their services to those who need them, for the usual and customary compensation. Nor is it material whether the party is in good credit, and able to pay for those services, as the case proceeds, or the counsel has to rely for his compensation upon the success of a cause he believes well founded. It is usual, and in many cases unavoidable, that the expenses incident to a controversy are paid by the attorney in the cause. Such advances are constantly recovered in actions for costs,

and there can be no pretense that the payment of such proper and legal expenses, in good faith, constitutes maintenance, whether they are expected to be paid at once, or from the proceeds of the cause.' Quoting from *Shapley v. Bellows,* 4 N. H. 355, the court went on to say: 'It is not uncommon that attorneys commence actions for poor people, and make advances of money necessary to the prosecution of the suit, upon the credit of the cause. Thus a man in indigent circumstances is enabled to obtain justice in cases where, without such aid, he would be unable to enforce a just claim.' The court also quotes another authority with approval, to the effect that 'there is no doubt but that an attorney may lawfully prosecute or defend an action in the court, wherein he is an allowed attorney, in behalf of anyone by whom he shall be especially retained, and that he may assist his client by laying out his own money for him, to be repaid again.' In the *Wallace* case it was not denied that the lawyers involved had made advancements in the way of paying the filing fee which was due when the case was instituted, and for the attendance of witnesses and for other necessary expenses incident to the preparation and trial of the case, 'but,' the court said, 'this is not sufficient evidence of an illegal and immoral contract, for but few cases of any kind are handled by the most exact and conscientious of the profession where they are not called upon to do many or all of the things complained of here, and where they do not hesitate to make these advancements without thought of wrong, and in most instances without thought of how or when repayment will be made.' "

In *Brush v. City of Carbondale,* 229 Ill. 144, at page 152, it is stated: "It would be just as reasonable to say that the employment of counsel to assist a State's attorney in a criminal prosecution with no other intent than to see that the law is enforced and vindicated

would render a person guilty of officiously intermeddling with a suit that did not concern him, or with stirring up suits or quarrels between the people of the State with a view to promote strife and contention, as to make that charge against appellant." *Rieman v. Morrison,* 264 Ill. 279, *Geer v. Frank,* 179 Ill. 570, and *Phillips v. South Park Com'rs,* 119 Ill. 626.

In the case before us it is contended by the appellant that the defendants had no interest in this litigation and their only motive in having the contract signed was to gain fees and profit for themselves by instituting litigation. The defendants do not claim they had any interest in this litigation until the contract was signed, then they did have a vital interest in it to the amount of $250,000, provided they could establish the fact that Howard S. Kretschmar or Constance K. Mock was an heir of Henrietta E. Garrett and entitled to a distributive share in her estate.

The contract in question was signed in April 1949, and this suit to declare the contract void was not started until the latter part of 1953. The plaintiff demands that the court hold the contract null and void and of no force and effect, and that the defendants be enjoined from taking any action to enforce it. This was the only relief prayed for in the complaint. It will be seen that over four years had elapsed after the signing of the contract until this suit was filed. It will be observed that this is a suit in equity and equitable principles must prevail. It is stated in *Stoner v. Stoner,* 351 Ill. App. 304: "(1, 2) A party seeking to rescind or set aside a transaction on the ground of fraud or inadequacy of consideration must move with reasonable diligence. *Huiller v. Ryan,* 306 Ill. 88; *Hamilton v. Hamilton,* 231 Ill. 128, 133; *Prather v. Hill,* 36 Ill. 402; *Ullrich v. Ullrich,* 299 Ill. App. 460; *Knaus v. Chicago Title & Trust Co.,* 365 Ill. 588. In *Huiller v.*

*Ryan, supra,* eighteen months had elapsed between the execution of a quitclaim deed and institution of a suit to set it aside for inadequacy of consideration. It was held that this was too long a delay. In *Prather v. Hill, supra,* a bill in chancery to set aside a sale by a sheriff was filed three years after the sale. The court there said: 'Where an application comes so late as the present one for relief, it should be satisfactorily shown that the party was prevented from making his application at an earlier period, before a court will grant relief. In this case no reason is shown for the extraordinary delay.' "

In *Kadish et al. v. Garden City Equitable Loan & Building Ass'n,* 151 Ill. 531 it is stated: "All the decisions on this question naturally rest upon the rule 'that where a party has accepted and made his own the benefit of a contract, he has estopped himself from denying, in the courts, the validity of the instrument by which those benefits came to him.' " To the same effect is *People ex rel. Nelson v. Homewood State Bank,* 294 Ill. App. 52.

It is our conclusion that the contract in question in this case does not violate the law in regard to maintenance or champerty. We agree with the trial court that the appellant cooperated with the public administrator throughout the course of this proceeding, and that she voluntarily signed this contract in question, and that there is no evidence in the record tending to prove the allegations of the complaint, and that by the plaintiff's entire course of conduct, she is estopped from maintaining the action. The order of the trial court should be, and is hereby affirmed.

*Judgment affirmed.*

Dove, J., concurs.

Judge Anderson took no part in the decision of this case.