**In the Matter of the Estate of Henry Baum-
garth, Deceased.
Orrin Baumgarth, et al., Appellees, v. Marie
Baumgarth, Appellant.**

**Gen. No. 47,699.**

First District, Second Division.

December 15, 1959.

Released for publication January 19, 1960.

Stephen Love, Edward D. Lapperre, and Sullivan, Jeffers, and Doheny, all of Chicago (Edward D. Lapperre, and James J. Doheny, of counsel) for appellants.

Edward A. Sinden, of Chicago, for appellees.

PRESIDING JUSTICE MURPHY delivered the opinion of the court.

This is a citation proceeding to discover assets in a decedent's estate. Respondent, Marie Baumgarth, widow of deceased, and her surety, The Hartford Accident and Indemnity Company, a corporation, join in an appeal from an order of the Circuit Court, directing her to deliver up and inventory $100,000 cash and jewelry, found by a jury to have been owned by decedent at time of death.

On May 19, 1955, Dr. Henry Baumgarth, then about 73 years old, a resident of Chicago, died intestate, leaving as his heirs at law respondent, his widow, and two sons by a previous marriage, Orrin and Henry D. Baumgarth. Respondent was appointed administrator about June 6, 1955, by the Probate Court of Cook County, and, as such, filed her inventory and bill of appraisement on August 2, 1955. She inventoried real estate, stocks, bonds, promissory notes, and goods and chattels appraised at $505. No currency or bank accounts were listed.

After a hearing on a citation to discover assets and objections to the inventory, the Probate Court ordered respondent to inventory a number of additional items of personal property, which was done on October 24, 1956. An appeal from this order by the sons resulted in a jury verdict, in a trial *de novo* in the Circuit Court, finding respondent withheld from the estate $100,000 in cash and certain items of jewelry. The instant appeal is from a judgment entered on this verdict.

The vital question is whether respondent took currency and items of jewelry from a small steel safe, which was kept in the basement of the family residence at 2144 Cleveland Avenue, Chicago.

Respondent and decedent were married on August 9, 1947, shortly after the death of decedent's first wife and, until his death, lived in his former home, a 3-story residence. A caretaker lived in the basement

for about two years prior to decedent's death, in a room about 10 feet from the safe. Decedent suffered a slight stroke on January 21, 1954, and, although partially incapacitated, was able to pursue a normal routine.

Respondent testified that in 1954, decedent gave her the combination to the safe and requested her to enter it to locate a hospitalization insurance policy. She opened the safe, did not find the policy; "I did not remove anything from the safe at that time. I saw a lot of papers and what looked like a large amount of money. I didn't count it." She again entered the safe, at decedent's request, in February or March, 1955. She withdrew some notes made by a Mr. Geiszl, checked them over with decedent, and part of the notes were returned to the safe, which had been left open for one hour, during the time the notes were checked. There was money in the safe at that time. She did not know how much, and it looked like it had been tampered with. The next day the notes retained were turned over to Mr. Geiszl, whom decedent, during his last four or five years, had loaned over $60,000. The remainder of those notes were inventoried, bearing interval dates between December 8, 1952, and November 11, 1953.

Respondent further testified that she next entered the safe on day of decedent's death, May 19, 1955, to get the cemetery deed. She found the balance of the Geiszl notes, some stocks and bonds, and insurance policies of a value between $80,000 and $90,000. The policies were divided between respondent and the sons, and the notes and bonds were sold for approximately $40,000. "All of the securities in the safe except the insurance policies were listed in the inventory filed in the Probate Court." The money was gone, and she told the caretaker about the missing currency on that day. She thought he was implicated in the removal of the money from the safe, because he had, on a number of

occasions and during her absence, permitted the sons to enter the residence to visit their father. She told the police about the missing money, and Orrin and Henry Baumgarth were cited into the Probate Court and questioned.

Orrin Baumgarth testified that he did not know the combination of the safe and had never opened it; that after the second marriage, and in 1947, Henry Baumgarth, while his father was hospitalized and without his knowledge or consent, opened the safe and took out $17,000, which he hid, but which was found under some "debris" by Orrin and decedent; he described a number of pieces of jewelry owned by his mother, and said that on a number of occasions his father had told him the jewelry and currency were in the safe and going to stay there; that in May, 1955, his father told him, in the presence of his brother Henry, and a William R. Kleinschmidt, that "he had $150,000 in cash in the safe, and mama's jewelry was going to go to us boys." He further testified that he believed loans made to Geiszl by decedent, during the last four or five years of decedent's life, totalled $42,000 but had been told the amount exceeded $60,000.

Henry Baumgarth testified that he had the combination to the safe since he was a small boy, and that in 1947 he had opened the safe without his father's consent or knowledge. He noticed that it was "crammed full of money," and removed $17,000. "After I saw so much money in the safe I started to count it. I got to $100,000.00 and then I got tired counting. There was quite a bit remaining." He returned the $17,000 to his father after decedent left the hospital. The combination to the safe was then changed, and he never learned the new combination, nor did he re-enter the safe. He related a number of conversations with his father, between 1947 and including May 1955, in which his father had told him that "he had $150,000 in the safe." After

his father suffered the stroke in 1954, he visited decedent quite frequently, and on several occasions the caretaker let him in through the basement, when respondent was not home.

William R. Kleinschmidt testified he was a dental patient of decedent, and in May 1955, about a week prior to decedent's death, in the presence of Orrin and Henry, decedent, in discussing the contents of the safe, mentioned jewelry and diamonds, and said, "I have got $150,000 in there." Henry Baumgarth's former wife testified that in 1947, before decedent married respondent, he told her that he was in the basement counting his money, and "counted to one hundred thousand dollars and got sleepy."

Another witness, Alexander Leaton, a 79 year old retired carpenter, the caretaker, testified that he had lived in the front part of the basement until several days after decedent's death, when he was invited to leave by respondent. There was a safe located in the basement, and he saw Mrs. Baumgarth enter the safe in 1955. This was the only time he saw anyone, including the doctor, open the safe. On an occasion or so, he let Henry Baumgarth into the premises through the basement door.

■■■■■■ In citation proceedings brought under the Probate Act (Ill. Rev. Stat. 1957, Ch. 3, §§ 335–339a), the court may examine the respondent on oath, may hear the evidence offered by any party, may determine all questions of title, claims of adverse title and the right of property, and may enter such orders and judgment as the case requires. The proceeding is purely statutory, and is neither at law nor in equity, and provides for an optional jury, as at law, for adverse questions of title and right of property. It is discretionary with the court whether respondent shall be permitted to testify, and the witnesses are deemed those of the court, no matter by whom examined. Testimony as to state-

ments made by the decedent has been held competent, even though the witness is a party in interest, and the statement is in support of his claim or in support of the ownership of the decedent of the property in litigation, as in the instant case. Witnesses interested in the outcome of the citation proceedings are not barred by the terms of section 2 of the Evidence Act [Ill Rev Stats, c 51, § 2] but for all practical purposes their testimony must be considered and weighed, as those of adverse witnesses. Courts lend a very unwilling ear to statements by *interested persons* about what dead men have said. Such evidence is subject to great abuse and will be carefully scrutinized, as well as considered with all other evidence in the case. Keshner v. Keshner, 376 Ill. 354 (1941); Storr v. Storr, 329 Ill. App. 537 (1946).

 In substance, respondent is charged with concealing and unlawfully appropriating assets of a decedent's estate, and the finding of the jury was tantamount to a finding that she was guilty of fraudulent conduct. Fraud may not be established by mere suspicion or surmise, but by evidence of circumstances and facts which are inconsistent with an honest purpose, and which convinces the mind of the existence of fraud. Fraud is never presumed and must be proved. The proof should be clear and convincing in its nature, as to leave the mind well satisfied that each element has been established. 19 I. L. P., Fraud, § 47.

██ ██ Citation proceedings are generally used as a vehicle for the discovery of evidence or for any proper information necessary for the recovery of assets of an estate and for its proper administration. The usefulness of the proceeding is enhanced by liberality in the admission of evidence and the examination of witnesses. However, the burden of persuasion remains with those who seek to find property of a decedent in the possession of a respondent. Their first hurdle is

to prove its existence, and second, that respondent has possession of it.

In the instant case, the testimony as to the unsworn self-serving declarations of the decedent, not subject to cross-examination and out of the presence of respondent, would not have been competent as against respondent, to prove the contents of the safe, even if decedent were alive. These statements are no more competent for that purpose because of his death, even though their admission may have been within the court's discretion, as held in Storr v. Storr, 329 Ill. App. 537, 547. The uncorroborated statements of decedent, standing alone, are not competent proof of the existence of the currency. The statement of his son Henry, as to what he saw in the safe eight years before, while he was surreptitiously removing $17,000, in the expectation of his father's death, is too remote and is of little probative value. The evidence as to the existence of $150,000 in currency, or even as to $100,000, is not binding on respondent. She was not present when the statements were made, and at no time has admitted they were true. There is no direct testimony by anyone as to $100,000 being in the safe at time of death or at any time after 1947. Even if the existence of the currency at time of death could be conceded, there is no evidence that respondent took it. She has denied possession or knowledge of it, and the evidence is not clear and convincing that she was the only one who had access to the safe.

As to the items of jewelry respondent was ordered to deliver up, there is no direct evidence that the brooch and two rings, which she testified decedent had given her, were owned by decedent's former wife. Respondent testified, "I don't know where my husband got the brooch and the two diamond rings he gave me." An unimpeached witness testified that decedent told

327

her that he had given respondent the brooch as a Christmas present, and that afterwards she had seen respondent wearing the brooch on a number of occasions. Respondent testified the safe contained a pair of $6.50 earings, set with zircons, which looked like diamonds, which were not inventoried because they had belonged to her deceased mother. In the supplemental inventory she listed a wedding ring with some small chip diamonds. Her testimony that the doctor gave her a brooch and two diamond rings is not sufficient to prove that these items had belonged to his first wife and should have been inventoried as part of his estate. Such a conclusion must be based on clear and convincing evidence.

■ We do not believe the evidence in this case was sufficient to sustain a verdict finding that respondent should deliver up and inventory, as assets of the estate of the decedent, $100,000 in currency or the specified items of jewelry. As to the currency, the proof lacks two essential elements: Proper evidence of the amount of currency kept in the safe, and evidence of any of decedent's missing currency being in respondent's possession. As to part of the jewelry ordered to be delivered up and inventoried, there is no evidence in the record to show that respondent ever had possession of the items; as to the remainder, there is a complete failure to prove by proper evidence that the items, admittedly in respondent's possession, had ever belonged to decedent's first wife. Storr v. Storr, 329 Ill. App. 537.

■ We believe the court should have allowed respondent's motion, made at the close of all the evidence, that the trial court direct the jury to find the issues for respondent, because there was a total failure to prove one or more of the necessary elements of the case. (Tucker v. New York, C. & St. L. R. R. Co., 12 Ill.

2d 532, 534 (1958).) Therefore, for the reasons given, the judgment of the Circuit Court is reversed.

Reversed.

KILEY and LEWE, JJ., concur.