Henry J. Brubaker and Civilla J. Brubaker, Appellants, v. W. E. Gould, W. E. Gould and Company, an Illinois Corporation, J. H. Lahman, Interlake Industries Corporation, and Harriet B. Gould, Executor of the Will of W. E. Gould, Deceased, Appellees. Thomas J. Cavanagh, Petitioner-Appellee.

Gen. No. 48,354.

First District, First Division.

March 5, 1962.

Rehearing denied March 22, 1962.

Kelly, Kelly & Kelly, of Chicago (John J. Kelly, Jr., of counsel), for appellants.

Schultz, Krinsley, Voorheis & Hedberg, of Chicago (Raymond Harkrider, of counsel), for defendant-appellee, J. H. Lahman, and Arthur Abraham, and Israel Dordek, of Chicago, for the remaining defendants-appellees.

MR. PRESIDING JUSTICE MURPHY delivered the opinion of the court.

Plaintiffs appeal from a decree dismissing their complaint for want of equity at the close of plaintiffs' evidence before a master in chancery. The transfer to this court of plaintiffs' direct appeal to the Supreme Court disposed of plaintiffs' theory that a freehold is involved.

The record shows that on February 24, 1949, plaintiff Henry J. Brubaker and defendant J. H. Lahman jointly accepted a letter of intent to purchase a U. S. Navy surplus plant at Rockdale, Illinois, from the War Assets Administrator. The price was $875,000, payable over a ten year period. A plant consisted of approximately 26 acres, improved with buildings, containing about 700,000 square feet of space. Brubaker

and Lahman made initial deposits of $30,000. On April 27, 1949, Lahman, Brubaker, and his wife Civilla, formed an Illinois corporation, Interlake Industries Corporation, for the purpose of taking title to and possession of the property.

On May 26, 1949, Brubaker, because of illness, assigned to Lahman all of his right, title and interest in the letter of intent of February 24, 1949. Lahman agreed to assume, perform and discharge all of the terms and obligations of the letter of intent; to assume payment of specified outstanding Brubaker notes; to pay Brubaker the sum of $1100, and to reserve for Brubaker a one-tenth interest in the common stock of Interlake Industries or any other corporation that might become the successor to the letter of intent.

On June 22, 1949, in exchange for Interlake stock, Lahman assigned his interest in the War Assets Administration letter of intent to Interlake. Of the stock then received by Lahman, he assigned 1,000 shares of common to Civilla J. Brubaker, and stock certificate No. 14 was issued to her.

Lahman, prior to 1949, had been borrowing money at high interest rates from defendant W. E. Gould & Company, which was in the business of lending money, primarily to corporations. After June 1949, Gould & Company commenced making substantial loans to Interlake, for which it received notes of Interlake. Interlake also picked up outstanding Lahman notes held by Gould & Company by the substitution of Interlake notes.

In 1950, Lahman and Interlake were in serious financial distress, Gould & Company held Lahman and Interlake notes and some Lahman "NSF" checks. After negotiations, Lahman and defendant W. E. Gould, principal owner of W. E. Gould & Company and acting on its behalf, entered into a contract on May 29, 1950, intending to take Lahman completely out of

425

Interlake and to put W. E. Gould & Company in full control as owner of all its stock. At that time Lahman, although the owner of 75% of the stock of Interlake, agreed to deliver to Gould & Company *all* of the outstanding stock of Interlake. Gould and Gould & Company agreed to "turn back" to Lahman and to Interlake, notes totalling $179,000, of which $67,000 were Lahman's and $112,000 were Interlake's. In addition, Lahman was to receive $11,000 in cash.

On June 1, 1950, Gould & Company took over Interlake and its properties, and Lahman stepped out completely. Gould was elected president of Interlake at a meeting purportedly held by *all* the shareholders on June 5, 1950, at which time, the record indicates, Gould or Gould & Company had possession of only Lahman's 75%. With the exception of the 1,000 shares held by the Brubakers, Lahman delivered to Gould the balance of the outstanding stock of Interlake shortly after May 29, 1950.

Up to this point, Lahman and Brubaker remained friendly and frequently saw each other. Lahman had told Brubaker of Interlake's difficulties in meeting the plant contract payments, and that he was going "to have to unload to somebody and it probably would be Gould." Finally Lahman told Brubaker that he had "made a deal with Gould & Company to carry the ball from there on," and that he had sold all of his interest in Interlake to Gould. Later, Lahman told Brubaker that the Gould deal included delivery of the 1,000 shares of the Interlake common held by the Brubakers, with no consideration to them. Several weeks later, Lahman started urging the Brubakers to return their Interlake stock to him, in order that he could give it to Gould. He stated that it was their duty to do so, that the stock was worthless, and he was in great distress and might go to jail if he did not get it. After

426

some delay, the Brubakers informed Lahman they would talk it over with their attorney, Sidney O. Simon, known to Lahman.

Simon, over a period of four months, had a number of conferences with Lahman and with Brubaker, separately and together. Lahman persisted in his statements that he was very heavily involved with Gould and had received a threatening letter—he had to have the Brubaker shares to deliver to Gould. The Brubakers did not want to give up their Interlake stock and were openly suspicious that Lahman had a collateral agreement with Gould for the return of Lahman's interest in Interlake. Lahman persisted in stating that he had given the stock to the Brubakers without consideration and felt that, as he was in difficulties, it was Brubaker's "Christian duty" to return the shares. Finally Lahman agreed to pay the Brubakers $5,000 in payment of some past due Lahman notes, which Brubaker held, and they agreed to give the stock to him.

On May 9, 1951, at a meeting at Simon's office attended by Lahman and Brubaker, Lahman gave his $5,000 check to Brubaker, and Brubaker gave to Lahman stock certificate No. 14 for 1,000 shares of Interlake common, endorsed by Civilla J. Brubaker. At that time Lahman delivered to Brubaker his affidavit, prepared by Simon, which stated that since June 1, 1950, he (Lahman) had no "interest of any kind or character, present or reversionary," in any of the shares of stock or real property of Interlake Industries; that the certificate representing 1,000 shares of Interlake common stock "is being sold and delivered by Civilla J. Brubaker based on the above and only to enable affiant to fulfill his contract"; and that the affidavit was made for the purpose of inducing her to deliver to Lahman the stock certificate. Lahman delivered the stock certificate to Gould that day, and

427

Interlake issued a new certificate to Gould & Company for the Brubaker shares.

On May 15, 1955, Lahman, as plaintiff, filed a complaint in equity in the Circuit Court of Cook County against W. E. Gould and Gould & Company, as defendants, Case No. 55 C 7294, in which Lahman alleges inter alia that the Lahman-Gould agreement of May 29, 1950, was executed under such circumstances that Lahman has the right to recover his shares in Interlake from Gould & Company upon doing equity, which he offered to do in his complaint.

In the Lahman-Gould complaint (copy of which is in evidence), Lahman alleges that the purported "sell out" of May 29, 1950, "was understood to be a further collateral protection to defendants and an accounting would be made from time to time." He further alleges that the defendants and their attorney, Israel Dordek, on or before April 4, 1955, knowing that Lahman was under subpoena by the U. S. Government as a witness in the case of United States of America v. Roberts Enterprises, Inc. No. 53 C 967, summoned Lahman to defendants' office and admonished him and "suborned the perjury of plaintiff under duress or threat as alleged that plaintiff testify falsely that the sellout of May 29, 1950, was legal and proper and that under duress plaintiff so testified and similarly in the case of Harold Ronin v. Lahman in the Circuit Court of Cook County, No. 52 C 187, when in truth and in fact the transaction was for collateral as hereinabove alleged more particularly."

Plaintiffs filed the instant complaint on September 9, 1955, after making a demand upon Gould and Gould & Company for the return of their Interlake stock. The complaint consists of four counts, all based on the theory that Gould and Lahman entered into a conspiracy and committed fraudulent acts, so as to defraud plaintiffs of their Interlake common stock and

428

of a one-half interest in the Navy surplus plant now owned by Interlake. They seek a rescission of the assignment of their interest in the real estate, a rescission of the transfer of their stock certificate, an accounting, and a receiver for Interlake. All defendants answered, denying the charges, and the cause was referred to a master in chancery.

The hearings before the master commenced on January 15, 1956, and plaintiffs closed their proofs on October 31, 1957. All defendants then moved for a finding for defendants under Section 64(5) of the Civil Practice Act. On March 12, 1959, the death of W. E. Gould was suggested as of December 21, 1958, by Harriet B. Gould, executor of his will. She answered the complaint "without prejudice to all proceedings heretofore had." She also moved to exclude the testimony of the Brubakers and Lahman and adopted the motion of the defendants for a finding and decree in their favor. The report of the master in chancery is dated May 27, 1959. The witnesses include both plaintiffs, their attorney, Sidney O. Simon, and defendants Lahman and W. E. Gould, who were called as witnesses under Section 60.

In his report the master found that plaintiffs were guilty of laches; that the evidence submitted by plaintiffs failed to sustain the allegations of the complaint on any of its counts; and recommended that the motion of all defendants for a finding and decree at the close of plaintiffs' evidence be allowed in all respects. The chancellor overruled all exceptions to the master's report, sustained the motions of defendants for a finding and decree, approved master's fees in the sum of $13,031.30, and dismissed the complaint for want of equity at plaintiffs' costs.

Subsequent to the entry of the decree, the chancellor entered an order directing the payment by plaintiffs of fees occasioned by the appointment of a re-

ceiver for Interlake. This appointment was made on the petition of plaintiffs during the pendency of the hearings before the master and was later reversed by this court. (Brubaker v. Gould, 19 Ill App2d 412, 152 NE2d 485.) Plaintiffs appeal from the decree of dismissal, the order allowing master's fees, and the order allowing receivership fees. They also ask for a review of the order of this court reversing the appointment of the receiver.

■ The principal question is whether the chancellor erred in entering a decree of dismissal at the close of plaintiffs' evidence. The motion of all the defendants at the close of plaintiffs' case was a procedural means of submitting the whole case to the court for a determination of the merits. In ruling on the motion, the court was required to weigh the evidence offered on behalf of the plaintiffs. Section 64(5), Civil Practice Act. (Banks v. Gregory (1959), 16 Ill2d 227, 231, 157 NE2d 12.) If there was any substantial evidence tending to prove plaintiffs' allegations, the motion should have been denied. (City of West Frankfort v. Fullop (1955), 6 Ill2d 609, 617, 129 NE2d 682.) In passing upon the motion, it is the duty of the court to weigh and consider the evidence to ascertain if there is enough substantial evidence to sustain a decree for plaintiff in the absence of rebutting evidence. (Fewkes v. Borah (1941), 376 Ill 596, 600, 35 NE2d 69; Banks v. Gregory, 16 Ill2d 227, 157 NE2d 12.)

The evidence in the instant appeal is voluminous, as the prior factual summarization indicates. Considering plaintiffs' evidence, it is our conclusion that some of the findings approved and confirmed by the court are correct. Nevertheless, we believe the decisive findings are contrary to the evidence and are erroneous.

■ ■ The finding that plaintiffs were guilty of laches in filing their complaint for relief on the stock

transaction is contrary to the evidence. Plaintiffs delivered their stock to Lahman on May 9, 1951, and on that day he delivered it to Gould. This is the transaction which plaintiffs seek to rescind and set aside on the ground of fraud. The Lahman-Gould suit was filed on May 15, 1955, and the instant suit was filed on September 9, 1955. There has been no change of stock ownership since May, 1951. Mere delay will not bar relief, where the injured party was ignorant of the fraud and filed his complaint within a reasonable time after acquiring knowledge of it. (Bremer v. Bremer (1952), 411 Ill 454, 468, 104 NE2d 299.) Neither Gould, Gould & Company nor Lahman have been prejudiced by the alleged delay of Brubaker in commencing the instant action, and no defendant has changed his position in reliance on plaintiffs' failure to take action at an earlier date. McCartney v. McCartney (1956), 8 Ill2d 494, 500, 134 NE2d 789.

We agree that plaintiffs' evidence does not sustain any of the allegations that Lahman, by means of fraudulent misrepresentations, procured the assignment of May 25, 1949, of Brubaker's one-half interest in the letter of intent for the purchase of the surplus plant. The evidence is clear that the terms of the agreement of May 25, 1949, resulted from discussions initiated by Mrs. Brubaker because of Brubaker's illness. The record shows that Lahman complied with his part of the agreement. On cross-examination, Brubaker testified, "I was never called upon to pay that so that this deal of May 25, 1949 really cleaned me up as far as what I had in the Rockdale deal and gave me 10% of the stock. . . . I didn't see anything wrong with this deal of May 25, 1949 as is evidenced by that contract. I didn't see anything wrong with it then and I don't see anything wrong with it now just so far as that deal is concerned."

■ As to the transfer of Brubaker Interlake stock, we believe that the evidence offered by plaintiffs sustains the allegations that the May 9, 1951, assignment was procured by Lahman by means of false and fraudulent misrepresentations, deliberately made with the intent to defraud the Brubakers of their complete interest in the stock.

Lahman freely admitted that he spent months trying to persuade the Brubakers to give up their stock; that there was a discussion prior to May 9, 1951, about Brubaker starting a lawsuit against Gould, in which Simon said he thought the Brubakers had a good lawsuit if Lahman joined as plaintiff; that Brubaker said to Lahman, in Simon's office, "Harold, look, I think I am doing you a favor by not giving you these shares. We cannot only enforce our rights on this but probably do you a lot of good," and at that time he (Lahman) said to Brubaker, "This is a debt of honor with me, I got the money from Gould when I couldn't get it any place else and I am not the kind of man that welches on obligations. I have made a commitment to Gould to deliver all the shares and I am not only honor bound, I am morally bound and also legally bound to deliver them, and that I am in for all kinds of trouble if I don't deliver them."

Lahman admitted making the affidavit of May 9, 1951, in which he stated he "had no interest of any kind or character, present or reversionary," in any of the shares of Interlake or its real estate. Lahman admitted the allegations of the amended complaint in the Lahman-Gould lawsuit, and also admitted that it was true that Gould assured Lahman that "even though this would be called a sellout, it was understood to be a further collateral protection to defendants and an accounting would be made from time to time."

We think a reasonable conclusion from this evidence is that Lahman deliberately signed the affidavit, knowing that the basic representations were false, in

order to induce the Brubakers to give up their Interlake stock and to foreclose them of any future rights in the stock, although he (Lahman) had an oral agreement with Gould that the delivery of the Brubaker stock to Gould was intended to be only additional collateral for Gould, and that Lahman, at the time of the execution of the false affidavit, believed he would ultimately recover all the Interlake stock from Gould.

■■ Fraud is established by evidence of circumstances and facts which are inconsistent with an honest purpose and which convinces the mind of the existence of fraud. The proof should be clear and convincing in its nature, so as to leave the mind well satisfied that each element has been established. (In re Estate of Baumgarth (1960), 23 Ill App2d 319, 326, 163 NE2d 201; 19 ILP, Fraud, 47.) We conclude that plaintiffs' evidence, with all reasonable intendments, is sufficiently clear and convincing in its nature so as to establish actionable fraud by Lahman in securing the Brubaker stock. Malewski v. Mackiewich (1935), 282 Ill App 593, 601.

■ We do not agree with the contention that there is no evidence that Gould and Gould & Company had any knowledge of Lahman's stock negotiations with plaintiffs. In admitting the affidavit of May 9, 1951, Lahman said, "I swore to it and signed it. The truth is that I had to sign whatever they put before me because I was under so much duress to pick up this particular certificate of stock belonging to Civilla J. Brubaker that I had to sign it in order to get the stock to deliver to W. E. Gould & Company. I was under duress from W. E. Gould. That is all."

Lahman testified further that he was completely under the domination and control of Gould and said he "was economically, spiritually and every other way subservient to Mr. Gould"; that after entering into the agreement with Gould on May 29, 1950, he had frequent conversations with Gould about the Brubaker

stock, in which Gould made urgent demands for the stock. At one time Gould said that "it was now near a year since the date of the agreement and it was up to me to get this stock of Brubaker's and fulfill the terms of the contract of May 29, 1950. I told him that I was having difficulty. I said the Brubakers were reluctant to surrender their stock; that they were refusing to give it up. Mr. Gould said that if it was a question of money that I should offer Mr. Brubaker money—*do anything in order to get the stock*—and so I began to approach Mr. Brubaker from a monetary standpoint then, and ascertained either through him or his attorney I don't recall which, what he would require to surrender the stock. I don't think I ever had any talk with Mr. Gould as to what steps he might deem necessary to enforce my obligation. . . . When I got the stock from Brubaker I took it over the same day and delivered it to Gould."

█ Finding as we do that plaintiffs' evidence as to Lahman's conduct in securing title to the Brubaker stock established fraud, we also believe that Lahman's conduct, taken in connection with the Lahman-Gould contract of May 29, 1950, and the subsequent conversations between Gould and Lahman, wherein Gould repeatedly demanded that Lahman secure the Brubaker stock, in which Gould told Lahman to "do anything in order to get the stock," is legitimate ground for the conclusion that there was a conspiracy between Lahman and Gould to secure the Brubakers' Interlake stock by any means whatever, legal or illegal, and that Lahman acted as Gould's tool in the negotiations. Lahman had to get the stock to give to Gould pursuant to their contract of May 29, 1950, and Gould wanted the stock to complete the ownership and control of Interlake by Gould & Company.

As was stated in Majewski v. Gallina (1959), 17 Ill 2d 92, 99, 160 NE2d 783:

"While fraud is never presumed, a conspiracy, as alleged herein, is rarely susceptible of direct proof, but must, very nearly always from the nature of things, be established by circumstantial evidence and legitimate inferences arising therefrom. (Commercial Merchants Bank and Trust Co. v. Kloth, 360 Ill 294, 306.) These inferences depend largely upon the common-sense knowledge of the motives and intentions of men in like circumstances. (Philadelphia Storage Battery Co. v. Kelley-How-Thomson Co. (8th cir) 64 F2d 834, 837; Garlick v. Imgruet, 340 Ill 136, 143.) Thus, fraud may be inferred from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation, the intimacy and relation of the parties at the time of the commission of the acts, and generally all the circumstances preceding and attending the culmination of the claimed conspiracy. (People v. Small, 319 Ill 437.) In this connection the court stated in People v. Small, 319 Ill 437, at p 449: 'It is seldom that any one act, taken by itself, will establish a conspiracy but when taken in connection with other acts it may appear clearly that the series of wrongful acts result from concerted and associated action. Considered separately the acts of the conspiracy are rarely of an unequivocally guilty character, and they can be properly estimated only when connected with all the surrounding circumstances.' "

Considering the Brubaker to Lahman to Gould transfer of the Interlake stock in the light of all the surrounding circumstances, we believe plaintiffs' evidence is sufficient to sustain the charge that both Gould and Lahman conspired to and did fraudulently secure the Brubaker stock.

■ ■ Our disposition of this appeal requires that the cause "be remanded to the trial court with directions to proceed as though the motion had been denied by the trial court or waived." (Civ Prac Act, § 64(5).) This necessitates our considering the order of the trial court sustaining "the motion of Harriet B. Gould, Executor of the Will of W. E. Gould, Deceased, to exclude and strike the testimony of the plaintiffs Henry J. Brubaker and Civilla Brubaker." This motion was made on the ground that the "Plaintiffs are incompetent witnesses against this Defendant under Section 2 of the Evidence Act."

The defendant executor contends that this motion was properly sustained because W. E. Gould died December 21, 1958, before he had an opportunity to testify on his own behalf. Smith v. Billings (1898), 177 Ill 446, 53 NE 81, is cited as conclusive on this point. An examination of that case indicates that the determinative facts are not similar. There the question for decision was whether the complainant was entitled to have his deposition considered by the court upon the final determination of the cause. Complainant's deposition had been taken during the lifetime of the decedent, the adverse party, and had been filed in the court where the cause was pending. It had been offered and read in evidence. Plaintiff announced his case was closed, and the matter was continued to a day certain. In the interim, the defendant died, his death was suggested, and his executors were made parties defendant. On their motion, the court excluded the testimony of the complainant as to transactions, conversations and communications between him and the deceased defendant. No further testimony being offered, the court dismissed the complaint for want of equity.

In its reasoning, the court said that the theory of Section 2 is (p 451) "that inasmuch as the deceased

436

*cannot* speak the living should not be allowed to do so; . . . it is the spirit and intention of the statute to preserve equality between the parties to a transaction out of which the action or proceeding grows." The court quoted from an Iowa case to express the rule by which the competency of testimony under Section 2 must be tested (p 452):

> ". . . it was deemed wise to provide that if one could not, by reason of death, give his version neither shall the other. The want of opportunity to assist in the preparation of the cause by the decedent is not the sole ground for excluding the testimony of the survivor, nor by any means the principal ground. The prime reason is found in the inability of the party to oppose his statements,—his testimony,—to that of the surviving adversary, and this has been more than once announced as the reason of the law."

Applying this reasoning to the instant case, it was error to exclude the testimony of the plaintiffs as against the defendant executor. W. E. Gould testified at length, under Section 60 of the Civil Practice Act, as to his dealings with Lahman, Interlake and the Brubakers. Then he was examined by his own attorney and the attorney for Lahman. Gould testified in opposition to the testimony of the plaintiffs and was provided with full opportunity to give his version of the facts as opposed to the version of plaintiffs. All of this occurred before plaintiffs closed their proofs. On January 13, 1958, Gould made a motion for a finding in his favor at the close of plaintiffs' case. If Gould deemed further testimony on his part important, he had ample opportunity to testify after plaintiffs closed proofs and before he died, over a year later, on December 21, 1958. The basic reasons for the rule of exclusion under Section 2 are not present here. At

437

this posture of the case, with plaintiffs proofs closed, we believe all of the testimony taken in this case during the lifetime of W. E. Gould should stand.

Plaintiffs contend that the master's fee allowed, of $13,031.30, are excessive and wholly unreasonable. Plaintiffs question the amount of time reported by the master and argue that the hours of work do not warrant the charges made. The record does not show any proof of the necessity for or the reasonable value of the various items reported in two master's certificates of fees and charges, which include 247 hours at $50 per hour for the master's services.

The allowance of master's fees rests largely in the discretion of the trial court. The sum to be paid "should be based upon the time necessarily devoted to the work, the intricacy of the proof, and the complications of fact and law involved in preparing the report of his findings and conclusions." (Horan v. Blowitz (1958), 13 Ill2d 126, 133, 148 NE2d 445.) A master's hearings are conducted in his private law office, and the cost of operating a law office today is considerable. However, in the absence of proof of justification, we think a flat hourly rate of $50 for a master's services is excessive. As this case is being remanded to the trial court for further proceedings, a full hearing should be had by the trial court as to the proper services of the master and the reasonableness of his fees.

Plaintiffs also contend that the decision of this court which reversed the appointment of a receiver (Brubaker v. Gould, 19 Ill App2d 412, 152 NE2d 485) is erroneous and should be reviewed. We do not agree. Our conclusions as to plaintiffs' evidence in the instant appeal do not require any modification of the views of this court expressed in the opinion filed in the previous appeal.

■ However, as contended by plaintiffs, a hearing should have been had in the trial court upon the merits and reasonableness of the fees allowed the receiver, his attorney and a public accountant. It was not proper for the trial court, in this case, to enter judgments against the plaintiffs for these fees, without evidence being submitted in support of the charges. The record reflects nothing upon which to base a finding as to the merits or reasonableness of the fees. Upon remandment, a hearing should be had as to the reasonableness of these fees.

It is our conclusion that the court erred in sustaining the motion of all defendants for a finding and decree in their favor, at the close of the plaintiffs' evidence. We believe there is substantial evidence in the record, to prove the allegations of plaintiffs' complaint that the transfer by them of their Interlake common stock was accomplished by a conspiracy to defraud plaintiffs of their stock, participated in by J. H. Lahman, W. E. Gould and W. E. Gould & Company.

In the absence, upon remandment, of the presentation of rebutting evidence by defendants, plaintiffs' evidence in this record is sufficient for a decree in their favor for the return to them of their Interlake stock as of May 9, 1951, with such further proceedings for an accounting as then may be proper, based upon plaintiffs' rights as Interlake shareholders.

Accordingly, the orders approving the master's fees and receivership fees, and the decree of dismissal of the Superior Court, are reversed. The cause is remanded with directions to overrule the defendants' motion to dismiss and, under Section 64 of the Civil Practice Act, to hear any evidence presented by the defendants and any rebuttal evidence by the plaintiffs, and to proceed in a manner not inconsistent with the

views here expressed. Costs in this court will be against the defendant appellees.

Reversed and remanded with directions.

BURMAN, J., concurs.

ENGLISH, J., dissents.

MR. JUSTICE ENGLISH, dissenting:
One paragraph of the majority opinion sets forth two principles of law as governing the chancellor in his determination of defendants' motion for a finding in their favor at the close of plaintiffs' evidence. These two principles are:

> Rule (1). It was the duty of the court to *weigh the evidence.* (This statement is in recognition of Section 64(5) of the Civil Practice Act which provides: "In ruling on the motion the court shall weigh the evidence.")
> Rule (2). It was the duty of the court to consider whether there was *any evidence,* together with all reasonable inferences therefrom, tending to prove plaintiffs' allegations.*

After merely mentioning Rule (1), the majority has proceeded to examine the record in the light of Rule (2) and on that basis has reversed the trial court's

---

* The wording of the majority is "any substantial evidence." Most all of the cases (which will be discussed later) referring to this rule use the term "any evidence." The rule, so far as it applies to this case, is the same. I shall, therefore, use the shorter term in this opinion and shall consider my remarks to apply, as well, to the term, "any substantial evidence."

A concomitant of the *any evidence* rule as found in all the decisions relied on by the majority (including the most recent expression of the Supreme Court) is that the evidence *must be considered in the light most favorable to plaintiff.*

determination. I cannot follow. The two rules are mutually exclusive, and application of the *any evidence* rule ignores or negates the statutory directive. It does violence to the long-established concept of "weighing the evidence" and the mandatory meaning of the word "shall."

The importance of selecting the proper rule for examination of the record by this court becomes apparent when there is added to Rule (1) the corollary principle that a chancellor's decision on the weight of the evidence, confirming a Master's Report, may be reversed in this court only when it is found to be palpably contrary to the manifest weight of the evidence. (Allendorf v. Daily, 6 Ill2d 577, 129 NE2d 673; Cuneo Press, Inc. v. Warshawsky & Co., 24 Ill App2d 163, 164 NE2d 258.)

Rule (2) is, of course, the same as that which governs the trial judge on a defendant's motion for directed verdict in a jury trial. It is, unquestionably, a proper principle in such a case and its application is essential to maintain the separate functions of judge and jury, with the jury as the fact finder. Thus, in a jury case, so long as there is "any evidence, together with all reasonable inferences therefrom" etc., tending to prove plaintiff's case, the judge must allow for the possibility that the jury might believe this evidence and disbelieve other evidence, even though the judge, himself, might consider the evidence as heavily weighted in favor of defendant. The basic reason, therefore, why it is improper for the judge to weigh the evidence on a motion for directed verdict is because to do so would constitute an invasion of the province of the jury as fact finder.

The situation is altogether different, however, when the judge, himself, is the fact finder. At the close of the plaintiff's evidence in a nonjury case, there is absolutely no reason for the judge to consider the evi-

dence in the light most favorable to the plaintiff, or merely to determine if there is any substantial evidence tending to prove plaintiff's case. Rather, as the trier of the facts, should he then consider the case as he would at the close of all the evidence, reaching his decision on the basis of that evidence which he believes, giving due regard to the plaintiff's burden of proof.

Under the view expressed in the majority opinion, if there were *any evidence* tending to establish a plaintiff's case, the defendant would be required to put in his evidence, even though the chancellor, as the trier of the facts, was then and there convinced by the proof already in evidence that there should be a finding in favor of the defendant. This is a procedure devoid of reason. It can be very costly in both money and time to courts as well as to litigants, and it cannot possibly serve any useful purpose. The day in court to which a plaintiff is entitled, is his own day and not the defendant's.*

The legislative direction that "the court shall weigh the evidence" is not a new concept requiring judicial interpretation to establish the meaning of the words used. There are certainly hundreds, and probably thousands, of Illinois decisions referring to, and accepting as beyond dispute, the process of weighing the evidence. The expression, "manifest weight of the evidence," without further definition than that implicit in the words themselves, appears in almost every volume of the Illinois and Illinois Appellate Court Reports, at least for many years.

---

* Even in professional baseball, which is essentially an exhibition, the home team is not required to bat in the last of the ninth inning if it has already won the game. How much more alert should not the courts be to terminate litigation at the earliest moment compatible with justice.

Instruction 2.01 of Illinois Pattern Jury Instructions * includes the following: "You are the sole judges of the credibility of the witnesses and of the *weight* to be given to the testimony of each of them." Then follows in the instruction a recitation of factors which the jury may consider in making such a determination, including the witness' opportunity to observe, his interest, manner while testifying, and so on.** The word "weight" thus used in reference to the evidence was not defined in that instruction, nor elsewhere in IPI, but was considered by the committee as so well-known and commonly used as to be "conversational," "understandable," "unslanted," and "accurate." (IPI Foreword, Page XIII.)

In hundreds of cases, also, our courts have declared the law applicable to a motion for directed verdict and, in doing so, have referred to weighing the evidence. For example, it was said in Peters v. Catt, 15 Ill2d 255, 259, 154 NE2d 280, that in such a situation "the only question on review is whether there is *any evidence* tending to prove the allegations in the complaint (citing cases). Neither the trial court, nor this court may *weigh the evidence* on a motion for a directed verdict. (Mitchell v. Van Scoyk, 1 Ill2d 160, 115 NE2d 226.)" More often than not, opinions, such as the one just quoted, and textbooks also, state this principle by setting off the two methods of considering the evidence as being in opposition to each other *(any evidence* as against *weight of the evidence).* (ILP Trial, § 132.)

* Published by the Illinois Supreme Court Committee on Jury Instructions and prescribed for use when applicable by Supreme Court Rule 25–1.

** In listing these and other factors, textbooks refer to them as matters which should be considered in determining *"the weight of the evidence."* (ILP Evidence, § 341; CJS Evidence, § 1031.)

443

The history of Section 64(5) of the Practice Act has an important bearing on this case. As first enacted in 1941, the section was applicable only to equity cases. Up to that time a defendant's motion for a finding at the close of plaintiff's evidence constituted a submission of the whole case for decision, and by making the motion the defendant waived the right to offer evidence. Consequently, as was held in Fewkes v. Borah, 376 Ill 596, 602, 35 NE2d 69, "If the motion is allowed and not sustained on review the proper judgment on review is to reverse the decree entered and direct a decree in accordance with the prayer of the complaint." Under the law as it existed prior to 1941, the cases are not consistent as to whether it was the duty of the chancellor to apply the *any evidence* rule on such a motion or to decide the case on the merits after *weighing the evidence.* That is of no moment now, however, because the 1941 statute spoke on that point as well as on the principal purpose of the amendment, namely, elimination of the defendant's waiver of his right to offer evidence. The section, as adopted in 1941, provided:

> Upon the trial of a proceeding in equity defendant may, at the close of plaintiff's case, move for a finding in his favor or move to dismiss the suit for want of equity. Either motion shall constitute a submission of the cause for decision on the merits. If the decision on the motion is adverse to the defendant he may proceed to adduce evidence in support of his defense, in which event the motion to dismiss or for a finding shall be deemed to have been waived and withdrawn.

It was subsequently held that this language did not change the old rule on waiver so far as the reviewing court was concerned. (Kanauske v. Clark, 388 Ill 357, 57 NE2d 890 (1944); Reiter v. Illinois Nat. Cas. Co.,

328 Ill App 234, 65 NE2d 830 (1946).) To remedy this situation, legislation was introduced in the 1947 session. Although the Supreme Court, after rehearing on review of the Reiter case (397 Ill 141, 73 NE2d 412 (1947)) made the modification itself, the legislature proceeded to adopt the corrective statute. In doing so, however, there was omitted from the 1947 amendment the earlier provision to the effect that the motion constituted a submission of the cause for decision on the merits. It was thus left somewhat unclear as to whether the chancellor should weigh the evidence in an equity case.*

During all this period the statute had no application to nonjury law cases in which the *any evidence* rule was consistently applied.

---

* The better view, I believe, was expressed by Judge Elmer J. Schnackenberg on November 15, 1949 when he filed an opinion in the Circuit Court of Cook County (Balfour, Guthrie & Co. v. Aschkenasy, 46 C 8196) in which he considered the chancellor's duty under Section 64. His opinion included the following:

"When a case is submitted on its merits, it means that the facts are to be ascertained from a consideration of all of the evidence, not merely that favorable to only one side. In that respect there is no difference between a submission of a case on the merits at the close of the plaintiff's case and such submission at the close of all of the evidence of both parties. If it were otherwise, in a situation where the defendant elects not to offer any evidence, we would have one rule of determination applied when the plaintiff rested his case and a motion for a finding in defendant's favor is made, and upon its denial, a different rule of determination would be applied to another identical motion thereupon made without the defendant offering any evidence. This can hardly be sound practice.

"In this case, it was the duty of the master in chancery, in passing upon defendant's motion at the close of plaintiff's evidence, to weigh the evidence and determine the facts in exactly the same way as if such motion were made at a later stage of the hearing when both parties have offered all of their evidence." (Chicago Bar Record, April 1950, p 136.)

445

In 1955 a Joint Committee of the Illinois State and Chicago Bar Associations undertook the monumental task of revising the Practice Act, and their work, as adopted by the legislature, included further amendment of Section 64(5). The purposes of the amendment, as expressed in the Joint Committee Comments, were to extend the section to cover nonjury law cases, and to add a sentence which "makes it clear that in ruling on a motion for a finding at the close of plaintiff's case, the court shall weigh the evidence." (Ill Rev Stats, Ch 110, § 64(5), p 317. See also Jenner and Tone, Historical and Practice Notes, p 320.)

The sentence added by the 1955 amendment does precisely that, and in the strongest possible language. It reads: "In ruling on the motion *the court shall weigh the evidence.*"

The Joint Committee noted further: "This clarifies the law applicable to equity cases (cf. Fewkes v. Borah, 376 Ill 596, 35 NE2d 69 . . . ) and changes the rule in nonjury law cases (see John Deere Plow Co. of Moline v. Carmer, 350 Ill 104, 108, 182 NE2d 762 (1932))."

The majority opinion relies on Fewkes v. Borah, 376 Ill 596, 35 NE2d 69, as authority for its *any evidence* rule. This was a case decided before the effective date of any of the legislation I have referred to above, and can, therefore, have no bearing on interpretation of the current statute.

City of West Frankfort v. Fullop, 6 Ill2d 609, 129 NE 2d 682, is also cited by the majority. This case, too, was decided before the 1955 statutory directive became effective and the opinion made no reference to Section 64(5).

The court in City of West Frankfort appears to have relied heavily on Fewkes and on Middleton v. Middle-

446

ton, 339 Ill App 448, 90 NE2d 248 (1950), both of which it cites with approval. The opinion in Middleton (also handed down prior to the 1955 amendment) makes it clear on the *any evidence* proposition that the court considered itself bound by Fewkes. Furthermore, the comment in the Middleton opinion was of no consequence to the decision in the case, as the chancellor's dismissal of the complaint was affirmed.

The *any evidence* rule was also referred to with favor in Taber v. Defenbaugh, 9 Ill App2d 169, 132 NE 2d 454 (a nonjury law case), but this, too, may have been unnecessary to the decision, as the trial court's dismissal order was affirmed. The decision was in February, 1956, no mention was made of the statute, and the trial undoubtedly took place prior to the effective date of the amendment.

Other recent cases touching on the subject include Doss v. Kirk, 8 Ill App2d 536, 132 NE2d 49, but this, too, was a nonjury law case tried before the effective date of the amendment.

Spitzer v. Bradshaw-Praeger & Co., 10 Ill App2d 445, 135 NE2d 114 (1st Dist) was another nonjury law case. It was decided in May, 1956, but the trial had been held before January 1, 1956, the date on which the 1955 revision of the act became effective. The statute was not cited, and the court did cite the Taber case and three other old cases (decided in 1917, 1904 and 1894) expressing the *any evidence* rule in nonjury law cases which the 1955 statute later abrogated.

In 1960 this court decided Continental Illinois National Bank & Trust Co. of Chicago v. National Casket Co., 27 Ill App2d 447, 169 NE2d 853, also a nonjury law case. In applying the *any evidence* rule, the opinion cited the Spitzer case and two jury cases. There

was no reference to the statute, and I can only assume that the court's attention was not invited to the 1955 change in the law.

Collinet v. Collinet, 31 Ill App2d 72, 175 NE2d 659, is an even more recent decision of this court in an equity case. In commenting on Section 64(5), the court acknowledged the statutory direction that "the court shall weigh the evidence" and stated at page 76:

"As at law, it is the rule in equity that a motion to dismiss at the close of the plaintiff's case must be denied if there is *any* substantial *evidence* tending to prove plaintiff's case. City of West Frankfort v. Fullop, 6 Ill2d 609, 129 NE2d 682." (Emphasis supplied.)

To my knowledge, the only other decision which has mentioned Section 64(5) since its 1955 amendment is Banks v. Gregory, 16 Ill2d 227, 157 NE2d 12, a case in equity for specific performance of a contract. The opinion in that case recognizes, as does the majority opinion in the instant case, the requirement that the court weigh the evidence, and further that the motion was "a procedural means of submitting the whole case to the court for a determination of the merits." (Page 231.) Then, however, the court proceeds to state that, in determining whether there is "*any evidence* tending to prove the plaintiff's allegation (it) and all reasonable inferences from such evidence must be considered in the light most favorable to the plaintiff." (Page 232.) No cases are cited. The trial court's dismissal of the complaint was affirmed on the ground that the contract was too vague and indefinite to be specifically enforceable. Since this was a ground apparently available on the basis of the pleadings, the court's discussion of the standard to be applied in considering the evidence would seem to be dictum.

448

In my opinion the provisions of Section 64(5) bring our practice into conformity with that provided in the federal courts under Federal Rule 41(b). That rule declares that on a defendant's motion at the close of plaintiff's evidence "in an action tried by the court without a jury the court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence."

In the case of Allred v. Sasser, 7 Cir, 1948, 170 F2d 233, the court said at page 234:

> "Appellant contends that at close of plaintiff's case his evidence should have been taken in its aspect most favorable to him, together with all reasonable inferences and, thus construed, that the evidence does not support the above findings of the Court. His view is that the Court should have limited its consideration of the evidence to the narrow limits applicable to the consideration of the evidence in a jury case upon a motion by the defendant for a directed verdict at the close of plaintiff's case.
>
> "Appellee takes the position, in which we concur, that under Rule 41(b) of the Federal Rules of Civil Procedure, 28 USCA, upon a motion to dismiss at the close of the plaintiff's case, the trial court determines the facts without being thus limited and must weigh and evaluate the evidence.
>
> "In this case the trial court was the trier of the facts, and in considering the evidence was not bound to view it in a light most favorable to the plaintiff, with all attendant favorable presumptions, but was bound to take an unbiased view of all the evidence, direct and circumstantial, and accord it such weight as he believed it entitled to receive."

449

To the same effect are Penn-Texas Corp. v. Morse, 7 Cir, 1957, 242 F2d 243, 246; Chicago & Northwestern Ry. Co. v. Froehling Supply Co., 7 Cir, 1950, 179 F2d 133, 135; Gary Theatre Co. v. Columbia Pictures Corp., 7 Cir, 1941, 120 F2d 891, 892. See also 5 Moore's Federal Practice, 2d Ed 1951, pages 1045, 1046.

I would not have stated my views so extensively did I not consider that Section 64(5), as I interpret it, expresses an extremely salutary rule and furnishes the courts with a valuable tool, much needed in the determination of their overwhelming volume of litigation. The statute has, as I see it, suffered many unintended blows from reviewing courts, and I fear for its survival under the lethal charge leveled at it by so highly respected an authority as the majority of this court. Certainly, it would be unreasonable to expect further remedial action from the legislature which could do no more than to direct, as it already has, that the court shall weigh the evidence.

The majority's recitation of facts is, of course, based on the *any evidence* rule. I believe there is no question whatsoever that, considered under the rule of *weighing the evidence,* the record abundantly supports the findings and conclusions of the master and the chancellor in favor of defendants. And under this interpretation the decree should not be set aside unless contrary to the manifest weight of the evidence. (Allendorf v. Daily, 6 Ill2d 577, 129 NE2d 673; Cuneo Press, Inc. v. Warshawsky & Co., 24 Ill App2d 163, 164 NE 2d 258.) Even applying the *any evidence* rule, however, it is my opinion that the complaint should have been dismissed.

Some of the facts recited in the majority opinion bear interestingly on its conclusions of fraud. I refer, for example, to the recital that Lahman and Gould "entered into a contract on May 29, 1950, intending to

take Lahman completely out of Interlake and to put W. E. Gould & Company in full control as owner of all its stock." This is in complete accord with the affidavit furnished by Lahman at the time of the transfer of the shares and at complete variance with the majority's conclusion that it was false.

Again, there is the recital that "Lahman agreed to pay the Brubakers $5000 in payment of some past due Lahman notes." And, on the other hand, the further recital that at the time of transfer of the stock plaintiffs' own attorney prepared an affidavit for Lahman to give to plaintiffs in which it was stated that the stock "is being sold and delivered." The record shows that the affidavit made no reference to notes; that the stock certificate was delivered to Lahman; but that the notes were retained by plaintiffs.

Further pertinent fact recitals in the opinion are to the effect that the negotiations went on for almost a year; that plaintiffs consulted with their attorney, Sidney Simon, about transfer of the stock; that "Simon over a period of four months had a number of conferences with Lahman and with Brubaker, separately and together"; that when the transfer was finally made Simon was in attendance and handled the closing arrangements.

It would seem to me to be significant, on the question of whether plaintiffs were defrauded, that they had advice of counsel throughout the negotiations and at the closing. This must be an important factor unless the record discloses that both plaintiffs and their attorney were fooled by a false affidavit. Quite the contrary appears. Neither placed any reliance on the affidavit, since, as the opinion states, the plaintiffs "were openly suspicious that Lahman had a collateral agreement with Gould," and Simon testified that

451

neither he nor Brubaker believed Lahman's representations.

What, then, are the majority's findings of fact as to fraud by Lahman? They appear to be that he spent months trying to persuade plaintiffs to give up their stock so that he could make delivery to Gould; that the stock was worthless; that he was in trouble on his contract with Gould and might go to jail if he didn't make good; that he had no intention of welching on his obligation to Gould, as he was honor bound.

Most importantly, however, the majority's finding of fraud by Lahman is based on his giving of the affidavit negativing his further interest in Interlake. The opinion finds that this was deliberately false.

I fail to see the materiality of Lahman's continuing interest as a basis for rescission, and, as I have pointed out, the record shows the affidavit was not believed by plaintiffs, anyway. Assuming its materiality, however, I believe that the record does not establish the falsity of the affidavit. It does show that there has been litigation pending since 1955 between Lahman and Gould to determine that very issue, and, after thousands of pages of testimony before a master, the case remains undetermined, and this court does not have the benefit of that testimony.

Conclusive in undermining the majority's reliance on falsity of the affidavit in establishing fraud against Lahman, is the presentation of this point in the briefs. Gould devoted a substantial part of his brief to the matter of the affidavit (pages 30–39). In their reply brief, however, plaintiffs waived the entire question, stating very simply:

> "The propositions discussed on pages 30–39 of Gould's Brief relating to the Affidavit are impertinent because *plaintiffs attach no significance to the Affidavit and did not even refer to it in*

*their Complaint or in their testimony."* (Emphasis supplied.)

I am willing to take plaintiffs' own evaluation of this point.

As to Gould, I find in his brief no contention that he had no knowledge of Lahman's stock negotiations with plaintiffs. As found by the majority, Gould contracted with Lahman on May 29, 1950 for the purchase of all of the stock of Interlake, some of which was owned by plaintiffs. Thereafter, from time to time, for almost a year Gould urged Lahman to make delivery. The key to the finding that Gould conspired with Lahman to defraud plaintiffs is apparently found in the quoted testimony of Lahman that he told Gould he was having difficulty getting plaintiffs' stock; that Gould told him that if it was a question of money he should offer money to Brubaker—do anything in order to get the stock.

The effect of this conversation on Lahman was indicated by his immediately following testimony: "so I began to approach Mr. Brubaker from a monetary standpoint." Ultimately, of course, money was paid to Brubaker and the stock was delivered.

In this, I see no conspiracy to defraud. I consider it entirely unreasonable to infer, as the majority does, from the statement attributed to Gould that he had directed or urged Lahman to do anything illegal.

The essential elements of a cause of action of this character are (1) that defendants made a representation in regard to a material fact, not merely an opinion as to value; (2) that such representation was false; (3) that such representation was not actually believed by defendants to be true; (4) that it was made with intent that it should be acted on; (5) that it was acted on by plaintiffs to their damage; *and* (6) that, in so acting on it, plaintiffs were ignorant of

453

its falsity and believed it to be true. (Bouxsein v. First Nat. Bank, 292 Ill 500, 502, 127 NE 133; Jorgensen v. Baker, 21 Ill App2d 196, 201, 157 NE2d 773; Schmidt v. Landfield, 23 Ill App2d 55, 161 NE2d 702, affirmed 20 Ill2d 89, 169 NE2d 229.)

For the reasons indicated above, I believe that the evidence has wholly failed to substantiate a case of fraud as to any of the defendants.

If plaintiffs had ever had a cause of action to rescind the sale of their stock, it was lost through laches. The agreement was concluded on May 9, 1951. I have been unable to determine from the record that anything of consequence to the claim of fraud was discovered or learned by plaintiffs after that date. The record and the majority opinion do disclose that the attorney who represented plaintiffs in the transaction had advised plaintiffs at the time that he thought they had a good cause of action against Gould. Yet, suit was not started until fifty-two months later. During this period the stock was not transferred (except by Lahman to Gould), but (as found by the master and the chancellor) the economic position of defendants in relation to the stock had been greatly altered, and there had been ample opportunity for plaintiffs to sit back and speculate upon the profit possibilities of Interlake, which had changed radically for the better. This, they cannot equitably do. It is well settled that, in order to rescind for fraud, the election so to do must be made promptly. Delays of eleven, twelve, seventeen and eighteen months, have been held too long. (Crawford Realty & Development Corp. v. Woodlawn Trust & Sav. Bank, 382 Ill 354, 361, 47 NE2d 81; Kanter v. Ksander, 344 Ill 408, 415, 176 NE 289; Huiller v. Ryan, 306 Ill 88, 94, 137 NE 484; Foston v. Swanson, 306 Ill 518, 523, 138 NE 119; Mock v. Higgins, 3 Ill App2d 281, 298, 121 NE2d 865.)

In the foregoing, I have considered the entire record, as the master did, without the exclusion of plaintiffs' testimony as to their claim against Gould. I believe, however, that this testimony should have been excluded, on the authority of Smith v. Billings, 177 Ill 446, 53 NE 81. See also Steele v. Sullivan, 337 Ill App 290, 85 NE2d 864 (First District, 1949), and Clark v. Harper, 215 Ill 24, 42, 74 NE 61.

The fact that Gould testified on call of plaintiffs under Section 60 does not change the rule. He was not, as stated by the majority, "provided with full opportunity to give his version of the facts as opposed to the version of plaintiffs." Under frequently reiterated decisions, he was strictly confined to matters about which he had been interrogated by plaintiffs' attorney. Certain it is that neither the chancellor nor we are in any position to determine that Gould's full story was told before his death. The majority's conclusion that Gould should have abandoned his motion to dismiss, and proceeded with his case in order to avoid some sort of estoppel in application of Section 2 after death, finds support in neither law nor logic.

I agree with the majority that there was no evidence of fraud concerning the agreement of May 25, 1949; that the previous decision of this court reversing the appointment of a receiver should not be disturbed; and that the case should be remanded for further proceedings concerning the fees of the master, the receiver, and the receiver's attorney.

The next-to-last paragraph of the majority opinion highlights the confusion which will result in the trial court from misapplication of the *any evidence* rule by this court. Having examined the record only under the *any evidence* rule, and having, therefore, not considered that part of the evidence favorable to defend-

ants, the majority, nevertheless, concludes that, on remandment, in the absence of the presentation of rebutting evidence by defendants, a decree should be entered returning the stock to plaintiffs. Under this direction, then, there may be a decree entered against defendants without the court's ever having considered the voluminous evidence in their favor which is already a part of the record in this case. This error should speak for itself.